# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|                          |   |                              |
|--------------------------|---|------------------------------|
| TOSHIA COOPER,           | ) |                              |
|                          | ) |                              |
| Plaintiff,               | ) |                              |
|                          | ) |                              |
| v.                       | ) | Civil Action No. 17-10 (ABJ) |
|                          | ) |                              |
| KIRSTJEN NIELSEN *et al.*, | ) |                              |
|                          | ) |                              |
| Defendants.              | ) |                              |

## **MEMORANDUM OPINION**

Plaintiff, appearing *pro se*, filed this action against her former employer, the Federal Emergency Management Agency (FEMA), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*, alleging race discrimination, retaliation, hostile work environment, harassment and wrongful termination. On March 29, 2018, the Court granted defendant's motion for partial relief under Federal Rule of Civil Procedure 12(b)(6), dismissed the retaliation claim, and directed plaintiff to file a revised version of her complaint to clarify the remaining claims and to "eliminate any retaliation allegations." Mem. Op. and Order at 5-8, 11 [Dkt. # 19] (*Cooper I*). Plaintiff has filed an Amended Complaint "for Harassment, Hostile Work Environment and Wrongful Termination Discrimination" [Dkt. # 20], and defendant has moved to dismiss or for summary judgment. *See* Second Mot. to Dismiss or in the Alternative for Summ. J. [Dkt. # 22].

The Court finds (1) that defendant has advanced legitimate, nondiscriminatory reasons for the actionable employment decision, which plaintiff has not adequately refuted; and (2) that plaintiff's hostile work environment claim is factually unsupported. So, the Court will grant summary judgment to defendant for the reasons explained more fully below.

# BACKGROUND

Plaintiff is an African American woman who worked for FEMA as a GS-7 legal secretary from October 22, 2011, to April 19, 2013, when she was terminated. Plaintiff was assigned to the Office of the Chief Counsel's Mission Support Division and, beginning in December 2011, was supervised by Deputy Chief Counsel Ashley Darbo. Working full-time, plaintiff provided administrative support to various attorneys, *see* Def.'s Stmt. of Material Facts as to Which There is No Genuine Dispute ("Def.'s Facts") ¶ 4 [Dkt. # 23], but it is Darbo's alleged behavior that gave rise to this action.

**A. Amended Claims**

In her two-count Amended Complaint [Dkt. # 20], plaintiff elaborates on the actions alleged in the initial complaint, including in large part those supporting the dismissed retaliation claim. Plaintiff summarizes the claims as follows:

> Count One: Harassment Discrimination in Violation of Title VII
>
> 1. Harassment Claim 1 - On June 5, 2012, Plaintiff's supervisor adversely punished the Plaintiff and reduced her one- hour lunch to 30 min lunch break because she engaged in Protected activity on June 5th and she suffered adverse isolation and discrimination and was singled out, despite other employees allowed a one-hour lunch.
>
> 2. Harassment Claim 2 - On June 5, 2012, Plaintiff's supervisor also falsely adversely informed the Plaintiff that she was not entitled to two 15-minute breaks because there were no such breaks because she engaged in Protected activity June 5th and she suffered adverse isolation and discrimination.
>
> 3. Harassment Claim 3 - On June 14, 2012 the next following week Ms. Darbo continued to punish and harass the Plaintiff and adversely used the Plaintiff flexible work schedule benefits against her and falsely accused the Plaintiff of "Gaming the system", and "Arriving late and leaving early" and [sic] implication of stealing government hours, because she engaged in Protected activity on June 5th and she suffered adverse isolation, humiliation and discrimination[.]

      4. Harassment Claim 4 - Letter of Reprimand - On March 7, 2013 the Plaintiff received an adverse Letter of Reprimand for sending an enveloped package in overnight mail to a judge after she/Plaintiff was given signed authorization from Ms. Darbo to overnight because the Plaintiff engaged in Protected activity on June 5th and she suffered adverse ridicule, isolation and discrimination.

Am. Compl. at 17, 18. And,

    Count Three: Hostile Work Environment Discrimination in Violation of Title VII

      1. Hostile Abusive Environment Claim 1 - Plaintiff ordered to *time* her work within her weekly work summary. On June 15, 2012 Ms. Darbo ordered the Plaintiff to time her work assignment as if she was billing a client in a law firm received from 8 attorneys she supported. (*material adverse action*).

      2. Hostile Abusive Environment Claim 2 - On April 9, 2013 Plaintiff was brought to tears when enforced to use her personal sick leave for visiting the FEMA nurse and falsely advised that vising the nurse was like "going to a personal doctor's appointment" (*material adverse action*).

      3. Hostile Abusive Environment Claim 3 - Plaintiff was rebelled against excused absence/administrative leave for visiting the FEMA nurse. On April 19, 2013 Plaintiff supervisor adversely resisted approving Plaintiff timesheet, ordering to use her personal sick leave instead and she cried. Plaintiff engaged in *another protective activity* and challenged her supervisor by going to HR to enforce proper administrative leave approval within Plaintiff's timesheet for vising the site nurse (*material adverse action*).

      4. Hostile Abusive Environment Claim 4 - April 19, 2013 Plaintiff was adversely *withheld* from her annual performance rating including a review (immediately after Plaintiff engaged in another *protected opposition* re: HR challenge to approve admin. leave for nurse visit) (*material adverse action*).

      5. Hostile Abusive Environment Claim 5 - April 19, 2013 Plaintiff was intentionally wrongfully terminated without cause the same day of *opposition* to HR on the basis of poor performance without producing forewarnings of any disciplinary concerns or deficiencies during the evaluating period of October 2011 thru September 2012 in her work. (*material adverse action*)

Am. Compl. at 18, 20-21 (italics in original); *Cf. Cooper I* at 2-3 (recounting same behavior).

Defendant has countered with evidence that Darbo:

- told plaintiff in June 2012 that she could not take two 15-minute breaks without taking leave but corrected herself a week later after seeking advice from counsel and "never" prevented plaintiff from taking 15-minute breaks;

- enforced against plaintiff, as of June 5, 2012, the agency's 30-minute lunch break policy by informing plaintiff that if she took a longer lunch break, she would need to account for it "with leave or time worked elsewhere in the day";

- requested on June 15, 2012, that plaintiff provide weekly work reports for "purposes of monitoring workload and ensuring that work is evenly distributed" and provided plaintiff a sample report that Darbo prepared for her supervisor;

- issued the Letter of Reprimand (LOR) to plaintiff on March 7, 2013, for failing to follow Darbo's instructions to double check with the requesting attorney, Scott Dowling, before sending a package by overnight mail;

- told plaintiff, after consulting with other deputies, to use sick leave for a visit to the agency nurse on April 9, 2013, which took at least an hour. But after being informed by Human Resources that administrative leave is typically used for such visits to the nurse, Darbo approved plaintiff's time sheet reflecting paid administrative leave, instead of sick leave;

- met on April 19, 2013, with plaintiff and Kelly Stevens from Human Resources, where they discussed plaintiff's performance evaluation, and then informed plaintiff that she was being terminated for performance deficiencies. At the time of the meeting, Darbo did not have a copy of the performance evaluation to give plaintiff as she requested, but plaintiff was provided a copy of the evaluation "a few days later." Agency policy does not mandate an in-person performance evaluation or the employee's receipt of said evaluation prior to termination;

- discussed performance deficiencies with plaintiff on multiple occasions in 2012 and 2013.

*See* Def.'s Facts ¶¶ 5-8, 10-11; 14; 15-18; 19-21; 24; 25-32, citing FEMA's Report of Investigation ("ROI") [Dkt. # 26-1] and Plaintiff's August 12, 2015 Oral Deposition ("Cooper Dep.") [Dkt. # 23-1].

**B. Termination Decision**

Plaintiff's termination was based upon her "final evaluation for fiscal year 2012"and her lack of improvement in the first quarter of 2013. Apr. 19, 2013 Termination Letter, ROI 282 [Dkt. # 26-2]. On separate occasions in 2012, Darbo, Deputy Associate Chief Counsel Jeffrey Mark Neurauter, and Principal Deputy Leigh Hoburg, to whom Darbo and Neurauter reported, had raised performance issues with plaintiff concerning "multiple errors" and her need to: follow instructions, prioritize, stop making decisions about projects "unilaterally," pay attention to detail, and communicate effectively. Defs.' Facts ¶¶ 26-31 (recounting discussions with plaintiff on February 7, July 31, September 24, September 25, and October 31, 2012).

On February 5, 2013, Darbo specifically complained to plaintiff about disorganized file boxes and informed plaintiff that she "needed to take better care in organizing files." Defs.' Facts ¶ 31. One week later, on February 12, 2013, Darbo informed plaintiff again about the need "to improve her communication and prioritization skills," and on February 22, 2013, Darbo informed plaintiff "that she needed to complete a task in a more timely manner and improve her prioritization." *Id*. ¶ 32. On March 12, 2013, following the March 7, 2013 LOR, Darbo informed plaintiff "that she needed to prioritize projects better and had failed to meet a deadline." *Id*.

In the April 19, 2013, termination letter, Darbo informed plaintiff:

> [Y]ou failed to meet the critical element of Communication and the performance goals of being Solution Oriented and Articulate. . . . Your performance has not improved in the current review period. You have been counseled regarding your performance and we've discussed specific project issues numerous times, including February 22, 2013, February 5, 2013, December 10, 2012, and November 28, 2012.

5

> The work you perform has a direct effect on our ability to meet our objectives. You were expected to be more attentive to your responsibilities and responsive to the tasks assigned to you. After noted efforts on your part, your produced work is not consistently well thought out, solution oriented, and accurate to the level it needs to be to allow effective assistance to the Branch or full utilization of your position.

Dkt. # 26-2, ECF pp. 105-06. Darbo closed by informing plaintiff of her right to file a discrimination complaint and the availability of free counseling through the agency's Employee Assistance Program. *Id*. 283. Plaintiff was given the option of agreeing to a settlement where she would resign instead of being fired, but she ultimately "elected not to resign and was issued [the] termination letter." Def.'s Facts ¶ 24.

## LEGAL STANDARD

When, as here, the Court relies on matters outside the pleadings, a Rule 12(b)(6) motion to dismiss must be treated as one for summary judgment. Fed. R. Civ. P. 12(d). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a

reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). But where, "after adequate time for discovery and upon motion," a plaintiff has not made "a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial," summary judgment "is warranted against" her. *Celotex Corp.*, 477 U.S. at 322.

## ANALYSIS

### A. Race Discrimination[1]

Congress enacted Title VII of the Civil Rights Act of 1964 to implement "the federal policy of prohibiting wrongful discrimination in the Nation's workplaces." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2522 (2013). The antidiscrimination provision "makes it unlawful for an employer 'to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race'" or other protected characteristics. *Steele v. Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008), quoting 42 U.S.C. § 2000e–2(a).

To state a Title VII discrimination claim, the plaintiff need only establish two elements: that "(i) [she] suffered an adverse employment action (ii) because of [her] race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir.

---

[1] Title VII does not provide an independent claim for "Harassment Discrimination"; therefore, the Court has liberally construed Count One of the Amended Complaint as plaintiff's revised race discrimination claim.

7

2008), citing 42 U.S.C. § 2000e–16(a). The claim may be proved by direct or circumstantial evidence. "Direct evidence of discriminatory intent alone is sufficient to survive summary judgment." *Robinson v. Red Coats, Inc.*, 31 F. Supp. 3d 201, 216 (D.D.C. 2014), citing *Stone v. Landis Constr. Corp.*, 442 Fed. Appx. 568, 569 (D.C. Cir. 2011) (per curiam). Hence, a statement that itself shows bias in the adverse decision is direct evidence that would generally entitle a plaintiff to a jury trial. *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011); *see Wilson v. Cox*, 753 F.3d 244, 247 (D.C. Cir. 2014) ("A statement that itself shows . . . bias in the employment decision qualifies as direct evidence.") (citation and internal quotation marks omitted) (ellipsis in original).

In the absence of direct evidence, as in this case, a Title VII plaintiff must prove her discrimination claim through the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The evidence must show at the least that plaintiff has protected status and the challenged employment action resulted in "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). A materially adverse consequence has been described as "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003), quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). Adverse employment actions may "extend beyond readily quantifiable losses" but "not everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001). Even if actionable, an "employer

8

may cure an adverse [decision] . . . before [it becomes] the subject of litigation." *Taylor*, 350 F.3d at 1293.

Plaintiff has adduced no evidence from which a reasonable jury could find or infer a materially adverse consequence from the challenged actions, save her termination. *See Cooper I* at 9-10 (dismissing discrimination claim "predicated on such things as restricted breaks, alterations in plaintiff's flexible work schedule, or the mandatory weekly work summaries"). Since plaintiff's deficient work performance -- about which the record establishes she was told repeatedly – is a valid reason for her termination, the Court is left with the "one central inquiry" of whether plaintiff has "produced sufficient evidence for a reasonable jury to find" that the employer's asserted nondiscriminatory reason was not the actual reason "and that the employer intentionally discriminated against the plaintiff on [the] prohibited basis" of race. *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008), citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008); *see Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1154 (D.C. Cir. 2004) ("[O]nce the defendant has responded with rebuttal evidence, the factfinder normally proceeds to the ultimate issue on the merits to determine whether the employer intentionally discriminated against the plaintiff."). Plaintiff must "demonstrate by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were rather a pretext for discrimination." *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1512 (D.C. Cir. 1995).

Plaintiff seems to admit in her deposition testimony that her race had nothing to do with Darbo's specific actions leading up to and culminating in her termination. Cooper Dep. at 144-147, 162. As for the weekly timed work reports, plaintiff admitted that "[p]eople who worked for Ms. Darbo," and even Darbo herself, were required to "turn in timed reports" and that perhaps

9

weeks had passed without plaintiff having submitted a timed report. Dep. at 144:2-14. Therefore, Darbo asked plaintiff to turn in "a report that covered the time" periods she had failed to report. Dep. at 144:11-19. When asked to explain how that request was discriminatory, plaintiff replied: "I wouldn't say that that task was discriminatory based on my race[.]" Dep. at 145:5-6. Similarly, plaintiff testified: "I don't think the actual letter of reprimand is based on my race." Dep. at 162:16-17. And when asked if she "ever hear[d]" Darbo "say anything disparaging about your race" or "about African-Americans in general," plaintiff replied "No" to both questions. Dep. at 147:1-9. Plaintiff adds, however:

> I can say that everything Ms. Darbo had me doing that was completely out of the norm, like the 15-minute breaks that she denied me, like peeking my head into her office, like giving me a 30-minute lunch limit while other people was taking an hour, and I was sometimes taking an hour and taking it with Bridget, by the two hours we spent at Carmine's together as a team, and you didn't make me alter that, you didn't make me put in any leave, I find that being discriminatory based on my race because she was singling me out to do -- not to give me my 15-minute allotment for my breaks that I was due. And other people was [sic] able to do it, and she didn't inform them.

Dep. at 145:7-18. Plaintiff points to Darbo's "body language, her tone, her cutting me off," which "then . . . became isolation," where she "always had to be on guard." Cooper Dep. 147:3-5. But these observations do not tie her supervisor's actions to racial animus, and "petty slights or minor annoyances that often take place at work and that all employees experience" are not themselves actionable under Title VII. *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013), quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see Craig v. District of Columbia.*, 74 F. Supp. 3d 349, 375 (D.D.C. 2014) ("Title VII offers no protection against trivial harms, petty slights, ordinary rudeness, or minor annoyances, and it does not establish a general civility code for the American workplace.") (citation and internal quotation marks omitted)).

10

Plaintiff mentions disparate treatment throughout her opposition, and she testified at her deposition that she "felt" Darbo's discrete acts were "a racial thing because she didn't do [the same things] to the other white staff." Cooper Dep. 269:5-6. A Title VII plaintiff may establish that the employer's asserted reasons were actually a pretext for unlawful discrimination by showing that she was treated differently from "similarly situated individuals." *Neuren*, 43 F.3d at 1514. To move beyond summary judgment, however, plaintiff must produce evidence "that all of the relevant aspects of her employment situation were nearly identical to those" of the white employees she contends were treated more favorably. *Id*. This entails showing "that [plaintiff] and the alleged similarly-situated employee 'were charged with offenses of comparable seriousness,' and 'that all of the relevant aspects of [her] employment situation were nearly identical to those of the other employee.'" *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115-16 (D.C. Cir. 2016), quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (other citation omitted). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's job and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Id*. Plaintiff has adduced no evidence of disparate treatment. She does not identify "the . . . white people" she contends were treated more favorably and the positions they held. Most importantly, plaintiff testified that she was the only "administrative staff under . . . Darbo's supervision," Cooper Dep. at 88:1-3, thereby rendering her incapable of identifying a suitable comparator.[2]

---

[2] "Bridget," with whom plaintiff took hour-long lunches, Dep. at 145: 11-12, is identified in the record as Bridget Powell, an African American secretary who was supervised by Deputy Associate Chief Counsel Neurauter. Def.'s Facts ¶ 3.

In sum, plaintiff's rebuttal to defendant's valid, nondiscriminatory reasons for her termination consists of conclusory statements of discrimination and self-serving conjecture based largely on discredited allegations about inconsequential matters. So, the Court finds that defendant is entitled to summary judgment on the race discrimination claim.

### B. Hostile Work Environment

Plaintiff's amended complaint alleges no new facts in support of her racially discriminatory hostile work environment claim, and her core facts lack "the sort of severe [or] pervasive conduct" to advance the claim. *Cooper I* at 10-11; *see Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014) ("To prevail" on a hostile work environment claim, a plaintiff "must first show that . . . she was subjected to discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.") (citations and internal quotation marks omitted, alterations in original)).

Nevertheless, when asked specifically about the alleged hostile work environment and how Darbo's actions "prevented [plaintiff] from performing [her] job duties . . . at FEMA," Cooper Dep. at 269, plaintiff replied that it "added stress" and "confusion"; she "was always on guard, . . . felt demeaned . . . excluded . . . harassed and badgered." Cooper Dep. at 269:1-4. But plaintiff's subjective feelings are not enough to defeat summary judgment, and she has not offered any evidence of "objective severity," which is "judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *see id*. ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.")

Similar to the complainant in *Brooks*, "[e]ach event [plaintiff] identifies as an example of abusive conduct fails to add materially to the alleged aura of hostility." *Brooks*, 748 F.3d at 1276. The record establishes that Darbo promptly corrected her positions on (1) the 15-minute break policy and "never" deprived plaintiff of that time, and (2) the appropriate leave for the nurse's visit, which was the only event that "brought [plaintiff] to tears." Am. Compl. at 9. As for the remaining events, "selective enforcement of a time and attendance policy [and workplace rules] does not necessarily indicate conduct giving rise to a hostile work environment claim." *Brooks*, 748 F.3d at 1276, citing *Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 74 (1st Cir. 2011). And, absent evidence of some tangible adverse effect, a supervisor's "tactless and ill-mannered" behavior is materially inconsequential. *Id.* at 1277. Finally, plaintiff not only admitted in her deposition to the accuracy of the Letter of Reprimand, *see* Cooper Dep. at 160-63, but testified that she did not "think" it was "based on [her] race," Cooper Dep. at 162:16-17. So, the Court finds that defendant is entitled to summary judgment on the hostile work environment claim as well.

## CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment. A separate Order accompanies this Memorandum Opinion.

*/s/ Amy B. Jackson*

AMY BERMAN JACKSON
United States District Judge

DATE: March 19, 2019